We'll hear argument next in the case of Watters v. Homeowners Association. Ms. Clay? Yes, good morning. Yes, you may proceed, Ms. Clay. Thank you, Your Honor. I'd like to reserve five minutes for rebuttal. May it please the court, my name is Robin Clay, and I represent Tonka and Terrence Waters, an African-American couple who purchased two lots in the Preserve at Bridgewater in Kokomo, Indiana. The homes in the Preserve range from the high $200,000 to approximately $400,000, and it's a very nice area, and the Waters' home was somewhere within the middle or higher part of that range. When the Waters first purchased their lots, they were the only African-American homeowners in the subdivision. They built their home and invested in the two lots because they intended for this house to be their forever home. Mr. Waters is an Army veteran who suffers from multiple disabilities incurred while serving our country. Those disabilities include an incurable lung condition, as well as PTSD. Mr. Waters is anxious and fearful around animals, and particularly around dogs. And this happened because while serving in the Army, he was cornered by a dog in enemy territory, and he couldn't scream, he couldn't yell, or he couldn't make a sound for fear of being discovered. Now when he's approached by dogs, by certain dogs, he freezes, he sometimes breaks out in a sweat, and he can't catch his breath. Ms. Clayton, before we go too far down that route, can I just clarify, please? You are not appealing the dismissal of the claims against Randy Lingard, Rob Dinn, Sherilyn Shook, David Barber, and Chris Monroe in their individual capacities, are you? I'm not, Your Honor. Okay, thank you. Yeah, yeah. And while we are on the issue of the contours of your claims, are you pursuing a theory of hostile housing environment in addition to a traditional discrimination theory? So I'm pursuing Section 3617, which refers to interference and harassment. So I guess in the sense that they fall under Section 3617, then yes, I am considering it to be a hostile housing environment. Is that something you briefed or argued below? No, Your Honor, I only argued it as an interference and a harassment claim. I'm not sure that there's a huge difference between the two, except that they kind of rely on the same facts and the same... But how could you raise for the first time before us a hostile housing environment claim if you didn't raise it before the district court? I'm actually not trying to raise it right now, Your Honor. I'm sorry, and I may have misspoke. I'm just saying that the two are very related and that I am arguing that their housing rights were interfered with and that they were harassed. Okay. So with regard to Mr. Waters' disability, the disabilities that he has do prevent him from protecting himself. He adequately shared details of his disability with Mike Ullery, who is a member of the Architectural Control Committee, and Mr. Ullery testified that he shared the information that he had with other HOA board members. When the Waters began building their home, they were met with consternation. Ms. Clayton, where did your client share any information about a PTSD disability with anyone on the board? Not the lung issue. I know that the record supports that there was some information he shared about his lung issues, but I don't see anywhere where he shared with them the PTSD issues and the dog issues. And so, Your Honor, that information was only shared to the extent that when he made his formal request for reasonable accommodation, he indicated that he was 100% disabled through the Veterans Administration and through Social Security. I'm sorry to interrupt. Other than just explaining that he had a disability and talking about his lung issues, is there anywhere where he told them he had PTSD because of his experience with dogs and that's why he needed this? No, Your Honor, but no information was ever requested of him for that. When they initially requested a fence, they went off of what the covenants and restrictions indicated. And the covenants and restrictions just said, in order for you to have a fence, you have to have a pool. So they purchased a pool, and we're going to get the fence. At that point, they really didn't think that there was a need, there would ever be any obstruction or any problem for them ever getting the fence. Is it your position that Mr. Waters' obligation was to make the defendants aware that he had a disability and that's sufficient, or that he does need to explain specifically what the disability is? So our position is that he had to make them aware that he had a disability. And if they required more information, they were certainly free to ask that information. When he presented the fact that he had a disability to the HOA board, their response was, the Fair Housing Act does not apply to us. There was never any information or request for additional information. And at that time, the parties had already kind of established this relationship where it was clear to the Waters, at least at that point, they had already filed their complaint with the Human Rights Commission, the local Human Rights Commission. It was clear to them, based on the different disparate treatment along the way, that they were not going to be treated fairly. And so there was never any, like I said, there was never any dialogue from the homeowners association requesting additional information. And like I said, Mr. Waters didn't know that it was needed. Ms. Clay, let me ask this question in a different way. One of the disputes in this case was the board's denial of the plaintiff's request to put up a fence around the pool. The board said, no, no fences are allowed, but you can put up a hedge. Did the Waters ever give the board a medical reason why a hedge would have been insufficient, but a fence would have solved the problem? Not until litigation, because there were fences in the neighborhood. People already had fences. And so I don't think it was clear to the Waters. I just want you to answer my question. Okay. Did they ever give a medical reason why a fence was superior to a hedge for dealing with any disabilities? What they told the homeowners association was that he had a disability. They did not, more than the loving condition. Look, I take it that your answer to my question is no. I'm asking whether they ever explained why a fence would be superior to a hedge. I believe that they did do, no, they did not say a fence would be superior to a hedge. And I have to correct the record. I don't believe that the HOA offered a hedge. What they said was that, is there another type of fence that we could consider? Can you give us an alternate for the fence? I think they also said an alternate to the fence, but as well they could use landscape vegetation for privacy. Because if that's the issue he had raised, he needed privacy. Right, right. They did say he could use landscape vegetation. But my clients did not understand that, because like I said, other Caucasian and other homeowners who did not have disability had fences. Had privacy fences and had fences that they didn't have to ask permission to have. Did your client propose any alternative style of fence? Yes, there have been discussions about alternative styles of fencing. Prior to filing the lawsuit? In response to the letter? There was, yes. I'm sorry. Yes, there were discussions prior to filing the lawsuit. Where in response to the letter asking for you to submit an alternative style of fence for approval, did you submit such an alternative style? So that, those discussions happened, it's my understanding, while the case was at the administrative level before my representation. There was no documents exchanged. There were no documents exchanged. As indicated in the brief, there was instances between the members of the HOA, when Kate Mamerill was the president of the Board Association. There was an incident wherein she passed Mrs. Waters while Mrs. Waters was standing in the subdivision talking to members of the Humane Society. And Kate Mamerill then gave Mrs. Waters the finger and called her a black B word and called her the N word. That, from our position, indicates that there was definitely discriminatory animus. During the time they were building their home, there was also just differences in the way that the Waters were treated with regard to requests for information, requests for restrictive covenants, requests to have a certain color for their home, requests to have a mailbox on their side of the street. They were threatened with litigation and they were denied requests repeatedly. Additionally, there was an incident that happened in a local Cracker Barrel wherein Kate Mamerill referred to the Waters' grandchildren who were there and called them little nigger monkeys. And I'll be honest, Your Honor, in preparing my argument for this case, I debated between whether to refer to the N word as N word or as niggers because I didn't want to offend the court and it's also uncomfortable for me to use that word. So I can only imagine that it would have also been uncomfortable for the Waters to hear that word in front of their grandchildren and in their own neighborhood. One of the reasons that the HOA gave for denying the Waters their privacy fence is because the privacy fence would block the line of sight. Ironically, after this lawsuit was filed, the president of the HOA, Ed Mamerill, has now erected a two-car garage that blocks the line of sight throughout the neighborhood. Additionally, they said that they had to go through certain protocols and there had to be permission in order for them to have a fence. However, we presented evidence that there are fences in the neighborhood where no permission was required. There's also a privacy fence in the neighborhood that is in contradiction completely of what the Waters were informed. The Waters filed this appeal based on their belief that the district court failed to find direct evidence of discrimination. They didn't view the information and the evidence in the light most favorable to the plaintiffs. And they placed the burden of the interactive process on the Waters. And they failed to recognize that a modification of a policy is a reasonable accommodation. The district court labeled the Mamerill's racially derogatory statements as too attenuated and that they were not connected to the challenge actions. This requirement would require the bad actors to literally say, I'm denying you a fence, you N-word, or you can't have the color home that you want, you black B. I don't think that's what the FHA had in mind. This almost requires a discriminatory statement to occur in the same breath as the denial, but it doesn't happen that way. I mean, as a plaintiff's attorney, I would love for it to happen that way, but it doesn't typically happen that way. The court also determined that the Cracker Barrel incident doesn't support a fair housing claim because it did not occur in the neighborhood. It was not at a board function, and it did not involve other HOA members. Again, that misses the mark because the harassment and discrimination does not have to occur at a particular site or at an event. It just needs to be an episode that began and grew in the housing environment. For example, in a sexual harassment case, if the boss makes a sexually explicit statement from his phone sitting at home, it's no less sexual harassment. If a co-worker sees an employee at work and calls them a derogatory name and then sees them again at Target and calls them a derogatory name, it's no less harassment. Additionally, to require the neighbors to run back to their neighborhood to make the statement would also be an unreasonable bar. The district court appeared to have given the HOA the benefit of the doubt by distinguishing a fence that was made to protect dogs acquired without the obstacles imposed on the waters, as no quick exception, as well as the fence that was acquired without having to ask permission at all. The evidence is clear that Caucasian homeowners were allowed to circumvent the rules. Perhaps standing alone, some of these issues that the waters raise are not huge issues, but when they are viewed in the totality of circumstances, which is required, it results in a denial and interference of equal housing rights. Clay, if you want to save any time for rebuttal, now might be a good time. Yes, Your Honor. I'd like to save the rest of my time for rebuttal.  Mr. Ramsey. Thank you, Your Honor. Mr. Ramsey for the defendant's appellees. A couple of comments in response to the argument that was just provided to clarify, there are no other privacy fences in the neighborhood that are similar to the ones requested by the waters. In the record, there's a picture, there's several pictures and a description of the other fence that's a five or six foot height and is not a wrought iron or picket style fence. It encloses a small alcove, it goes around a small area of the house to house dogs that is not surrounded by a pool or the part of the yard. So there is no similar situated fence to the one that the waters requested and were denied. Also, to clarify, the HOA board made very clear that the waters could have a fence. They repeatedly were told they could have a wrought iron fence plus vegetation and were invited to submit a request for another fence. And that's where the communication broke down. There was no response from the waters at that point. So the last communication on the fence issue prior to the lawsuit was the invitation from the board to submit alternative plans for a fence. And they suggested vegetation for the privacy, which again was the only... Is that fence you're referring to earlier in the picture, the Exhibit 7 fence, it's six feet tall? And you're saying that's not a privacy fence? It's six feet tall and it appears to be solid? Yes, Your Honor. So that fence, that is Exhibit, I believe it is Exhibit G. It's a document 54-1, page 49, and it surrounds a small alcove of the house to house dogs. Adjacent to that fence is the picket-style wrought iron fence that surrounds the yard. So when these people built the house that had the privacy fence area, they requested from the builders, this was before the HOA or the Architectural Control Committee existed, to have a small enclosed area around their house to house a dog. Okay, so your real point there is it was built before the HOA in the early days. Not that it's not six feet tall, it's not solid. It is six feet tall, it is solid. Yes. It looks rather large from the picture. The type of the fence is the same. The difference is it doesn't surround a pool in the yard. The fence that surrounds the pool of that house is the... It keeps the dogs, not the pool. Correct. And it's also built around the alcove in the house so that it doesn't really add to the... It doesn't add to the line-of-sight disruption that the other types of fence would create. And then the other, there was another fence referred to in the record as a privacy fence, but that's, as the District Court noted, was a demonstrably false claim. That is the short three-foot garden fence that surrounds a garden at the back of a neighbor's house. So those are the only two other fences that have any sort of a solid design in the neighborhood. In addition, a point that is critically important is that multiple other homeowners requested the type of privacy fence that enclosed a portion of the yard similar to what the Waters requested and were denied that request. In fact, one of the defendants in this case, Robert Dinn, initially inquired about having a privacy fence around his pool and part of his yard and was then told he could not have that kind of fence. And this was before the Waters request. There were two other requests made in the same general time frame as the Waters request, and both those neighbors were told you can't have that kind of fence. Two of them had, one of them ended up having an electric dog fence instead of the large fence that the privacy fence has requested. So the point is that the Board and the Architectural Committee has been consistent in denying requests for privacy fences, and this was not in any way a disparate treatment of the Waters with respect to their fence. On the disability point, so I guess the fence has two components, right? The Waters have claimed that the denial of the fence was racially motivated and was also a failure to accommodate under the Fair Housing Act. On the failure to accommodate, again, there were multiple opportunities that the Waters could have had to explain Mr. Waters' disability further. And even at the district court level, there was never any showing that this type of privacy fence was necessary for him. Why should we expect the Waters to do that? When the Waters say to the HOA, I have a disability, I'd like a fence, and the HOA responds saying, we've looked at the Fair Housing Act, and it doesn't apply to us because you're not engaged in the sale or rental of a home,  to engage in this process with the HOA when the HOA has rejected the entire legal basis for the request? Yes, Your Honor, and the HOA, I'm not going to say that the HOA's legal position was correct because it wasn't correct. We've acknowledged the Fair Housing Act does apply post-purchase to the house. So this letter that the HOA took was based on some incorrect legal advice they got, that part of it. Or the HOA did, at the end, well, I guess there's two components. One, the HOA at this point is aware of a disability, and they're aware of the lung condition Mr. Waters had, and that's what leads them to say that we're considerate of privacy and recommend the use of landscape vegetation for privacy. If you wish to erect a fence, please submit an alternative design for approval. So they had the opportunity to engage in further dialogue regarding the type of fence they had, and there was an opportunity. Even putting aside that, though, the evidence in this case submitted even after this request was denied, there hasn't been any showing that Mr. Waters' PTSD requires the vinyl 6-foot privacy fence that he has requested and that was rejected as opposed to a 5- or 6-foot wrought iron fence with vegetation. What's your understanding of the state of the law on that issue? Were the Waters required to make the defendants aware that he had a disability, which they did in their letter, or were they required to go into detail about what the disability is? Well, based on the response from the HOA, they were required to at least provide some context for the type of disability. I mean disability in the broad sense with no explanation as to why the fence, why this type of fence, I'm sorry, is necessary, does not meet their goals, particularly when, although I understand Your Honor's point, and it is correct that the HOA said the Fair Housing Act doesn't apply to this situation, did not simply end the dialogue. They did say, you know, please submit. And I'm asking where do you ground that in the case law, about their obligations to go into further detail beyond making the HOA aware that they had a disability? It would be as part of the general interactive process. And, again, if the HOA had simply said, you know, you're done, you can't have any fence, period, the matter is over, that would be a different case. But while they did say no privacy fence, they did say you can have other kinds of fences, please submit an alternative style. So they were continuing the dialogue. And at that point is where the warders had the obligation to say something or at least explain why, what the HOA was offering, which was a wrought iron fence and vegetation. Isn't that somewhat of a mixed message to the warders? The message, A, the entire legal basis for your request does not apply to us, but, B, here's another different type of fence we would consider. And we're not going to tell you we want more information about your disability, but secretly, privately, we want to know more about the disability. But the FHA does not apply to you. No, I understood. And, again, I agree that this letter that was written by the HOA at this point in the process did not accurately state the law. And there may have been some mixed messages, but the message that was clear was we are not denying your request for a fence. We're denying your request for a privacy fence. And, again, even with the information that was submitted post-filing, post-case, there's been no showing that a privacy fence is required for Mr. Waters to be able to enjoy his house, which is what you need to show under the FHA accommodation provision. With respect to the discrimination case under 3617, the warders have, as Ms. Clay pointed out, pointed to two racist statements made by one of the individual defendants in this case. And there's no summary judgment. We have to assume those were made. The defendants denied that they were made, but for a summary judgment we assume they were made. The reason why those two statements don't get the plaintiff's past summary judgment is that there's no nexus between those comments and a protected action under the Fair Housing Act. The one incident took place at a restaurant and was not made in the context of a dispute over housing rights or a request for housing rights. And it was also by somebody who was not on the board at the time. Mrs. Mamrell was not on the board at any point after the warders moved into the neighborhood and was not, so therefore couldn't have been a decision maker. The other one occurred after Mrs. Waters had called the Humane Society  and Mrs. Waters made a, I'm sorry, Mrs. Mamrell allegedly made a highly inappropriate statement to Mrs. Waters. Again, she was not on the board at the time. This was not a board statement. This was not made on behalf of the board or anybody else. This is clearly a dispute between two neighbors in the neighborhood where one of those neighbors allegedly, for the purpose of summary judgment we would assume, made on two instances racially offensive, highly offensive statements. It is important, though, to recognize the timeline. So there have been two, those two instances. One happened in March of 2016. One happened in June of 2017. And under this court's precedence, you have to have more than isolated instances of this to establish that fourth element of motivation by intent to discriminate. And the case law has been clearly decided in our brief that these isolated type instances do not give rise to a Fair Housing Act claim. And, again, the other problem is that there is no nexus between those statements and challenged or protected actions under the Fair Housing Act. With respect to the pet issue, which is something else that was relied heavily on in the briefing, again, the plaintiff can't show any motivation by an intent to discriminate based on the way that the HOA or the board doesn't enforce the pet restrictions in the covenants. The evidence is clear in the record that there was no enforcement of these covenants regarding pets before the waters moved in. There's been no enforcement after. There's no evidence that this was somehow a targeted enforcement of the waters or they're being treated differently than anybody else in the neighborhood. There's evidence in support of the inference that there are potential violations of the covenant, but there are also many people who have had the same sort of thing happen with pets or animals in the neighborhood. I mean, this neighborhood backs up to a preserve and there's animals all around the neighborhood, which is the testimony in the record. This is kind of what people grew to live with when they moved into this neighborhood and chose to live there. So there is no, with respect to the pet complaints and lack of enforcement, there is no interference with a protected activity and there's no intent to discriminate. The other issues, I mean, I think those are the main two issues that the lawyers have focused on in their briefing, the pet issues and the defense issue. And again, there's no evidence that anybody was, that the lawyers were treated differently with respect to their offense. So you can't get to the, you can't get past summary judgment on the 3617 claim for discrimination. There's nothing in the record that shows they were treated differently or unequally with respect to the pet covenants or any other covenants for that matter. And then again, with the fair to accommodate claim, there isn't been any evidence that the, you know, even if there was a breakdown of the interactive process, and I think we touched on this earlier, but there is no claim, separate claim for the interactive process breaking down. So even if the board or the HOA should have written their letter differently or should have acknowledged that the FHA, the Fair Housing Act, could apply to these post-purchase claims, there is no evidence that the Waters even could have established at that point. And they certainly have established prior to the summary judgment order that the privacy fence, as opposed to a different kind of fence, denied the Waters an equal opportunity to reside in the neighborhood or as a necessary accommodation for Mr. Waters to be able to use his backyard as a pool. I have nothing further, unless there are any questions. It seems not. Thank you, Mr. Ramsey. Thank you, Your Honor. Anything further, Ms. Clay? Yes, Your Honor. First, I just do want to correct the record that the six-foot fence that the other family has is the Smith family. The HOA and the covenants were actually established in 2004, and the Smiths moved in in 2007, and the member of the Architectural Control Committee testified that that was the timeline there. So the HOA and the covenants were in place at the time that that family did get their six-foot fence. The other issue, the point that we want to make, is that it's not just that the six-foot fence is one thing that they didn't receive. There's a repeated pattern of them being denied information, being denied accommodations, and being denied exceptions that were made for Caucasian homeowners. It's not just if there was a breakdown in the communication, number one, that's an issue that should go before the jury to determine who actually committed the breakdown. But it's not that they were just, you know, they called, they said the N-word in March, and they said the N-word again in June. In the interim, the waters were, the people defecated on their property, they were denied colors, they were threatened with lawsuits, there was a protective order filed against them. I mean, there's a series of things that happened against them, and they are the only African-American family in that subdivision that occurred that didn't happen to other homeowners. And so, I mean, I think that that makes it clear that there's nothing that separated them from anyone else except the color of their skin, and they were accompanied by racial epithets along the way that were made by decision-makers. And so, I think that that, to say that those two are separate in an isolated instance and have nothing to do with one another is simply not true when you're talking about the people who were the decision-makers in the case. And based on the information, Your Honor, we just believe that there's enough information for this issue to go to the jury and for the jury to decide whether housing discrimination actually occurred. Thank you. Thank you very much, Counsel. The case is taken under advisement.